The indictment charges the defendant with the forging, with intent to defraud, a certain written receipt, purporting to be an acknowledgment of the payment of money upon a debt due by him, in form as follows:
"Rec'd of W. T. Bailey eight hundred dollars on land, to be credited on his land note, this 15 May, 1883.
"Mr. Walton accept this. A. D. GAGE."
The defendant was tried upon his plea of not guilty at Fall (529) Term, 1887, of the Superior Court of Iredell, and convicted by the verdict of the jury.
From the judgment of the court sentencing him to imprisonment in the penitentiary at hard labor for ten years an appeal is taken to this Court. *Page 413 
The prosecutor, W. W. Walton, into whose hands had come, as executor of A. D. Gage, the defendant's note, given to the deceased in his lifetime, in the sum of two thousand dollars, the balance due upon a sale of land and to which the writing has reference, testified that the testator died in March, 1885, in possession of the note, which bore date of 1883, and in December of the year of his death the defendant came to witness, asked him to compute the interest thereon, which was done, and the amount, $315, as well as $300 of the principal, was paid by the defendant, who then and repeatedly afterwards promised to pay the balance as soon as he could.
Early in January, 1887, witness was pressing for further payment when he received a letter from the defendant in these terms:
Mr. WALTON.
DEAR FRIEND: — Mr. Henry Burke has failed in getting any money, and so has Mr. Tucker, so far.
Mr. Tucker has been riding 8 or 10 days trying to find a man that has the money, but has not found him yet. I have never seen such a time for money in my life. If they fail, I will not be able to pay you any before spring myself, but I will see you soon.
I will be away from home a few days. I will see you soon.
Yours truly, W. T. BAILEY.
10 January, 1887.
That about the first of the next month witness went out to see defendant, and when about to leave, defendant said he had a secret (530) to tell him, which was that Dr. Gage had given him a receipt for $800 on the note, and produced the writing described in the indictment; that the receipt and signature are neither in the deceased's handwriting, with which he is familiar, having married a granddaughter; and when shown witness the defendant said he had promised to keep it a secret until 1889 because the deceased had gotten the money to pay a colored woman with whom he had cohabited.
The witness said, when first seen, the paper was fresh and unrumpled, and when next seen it was much soiled and rumpled, and in support of his opinion that it was spurious pointed out similarities between it and defendant's handwriting, and the differences between it and that of the deceased.
Numerous experts of high character and accustomed to examine writings in business transactions, and who had long known the deceased, expressed an unhesitating opinion against its genuineness, and comparing it to the will of deceased, admitted to have been written by himself, declare their belief that the writing did not come from the pen of the same person. *Page 414 
One Jule Bailey, a witness for the defendant, swore that in the spring of 1883, on May 14th or 15th, while working in the meadow, Dr. Gage came down to the meadow and inquired for defendant, who was not there at the moment but soon arrived, and was greeted by the defendant, who asked, "How are you, doctor?" to which the reply was, "I am here yet." That witness, going off to his work, he heard them counting 1, 2, 3, 4, 5 twice over, and, being called up by the deceased, he saw a piece of money and Dr. Gage said, "Jule, there are eight new bills; did you ever see the like?" They then counted them over again four piles, and Dr. Gage remarked, "Jule, that makes $800; Mr. Bailey is a (531) gentleman, he has met his payment before it was due," and explained why the payment was not to be mentioned as the money was to go to women of his color, etc. That the money, $800, was put in the buggy under the seat, and carried away by the doctor, before which he saw a small scrip of paper, the size of the receipt, and heard the defendant say it was scribbled up, and the answer was, "I've been sick, but Walton will receive it."
One John Fox testified to being present, saw the money, $800, paid, also a blue paper, said by the deceased to be a receipt.
One Edward Young, in May or June, 1883, as he testifies, in a conversation with the deceased, heard him say "that Bailey had paid him $800, and he had receipted him for it."
One J. H. Lackey swore that while building a house for defendant in the fall of 1883 the deceased came every day or two, and he heard a conversation in which deceased said, "That money you paid me, that $800, is nobody's business. You can pay over the balance to Mr. Walton. I don't want anybody to know it until I am dead and gone, it might scandalize me." Making some remark about women.
A. W. Jamieson testified to hearing Dr. Gage say, two or three years before he died, that Bailey had paid nearly all off, and the witness's impression is that he stated that he had gone or was going to Bailey's to get $800.
The defendant's own testimony is full and positive of the payment of $800 in new $20 bills at the time and place spoken of by other witnesses, of the giving of the receipt, of his objection to it, and the answer of deceased that it was all right, detailing all the particulars of the conversation that ensued and why the transaction was not to be mentioned. He further gives an account of the manner and for what the debt was contracted, and corroborates what other witnesses (532) testified to when he was present, and denies, unequivocally, the forgery charged.
The other testimony was mostly as to the good character of the various witnesses examined. It will be seen that the conflict in the evidence *Page 415 
is mainly between testimony of experts to the spuriousness of the writing and that of others to the fact of the payment of the money and the delivering of the written acknowledgment of it charged to be a forgery, upon the consideration of which the jury arrived at the conclusion adverse to the accused.
There was no exception to the ruling upon the reception or rejection of evidence, nor were any instructions asked nor those given objected to until after the rendition of the verdict.
The charge was to this effect: The jury are the sole judges of the weight, if any, to be given to the testimony of each witness. They may believe all or none of the testimony of each witness, according to the conviction produced on their minds of the truth or falsity of what each witness has sworn to. The presumption of law is that the defendant is innocent, and the burden is on the State to satisfy the jury of the defendant's guilt beyond a reasonable doubt. If the jury are satisfied, beyond a reasonable doubt, that the defendant forged the signature of A. D. Gage to the $800 receipt or procured it to be done, with intent to defraud, they will find the defendant guilty; if not thus satisfied, they will find the defendant not guilty. Three days after the rendering of the verdict a new trial was moved upon the following grounds:
1. For that the court did not tell the jury if the defendant paid the $800 to Gage, and he thereupon gave the receipt as and for a genuine one, the defendant would not be guilty, although neither the body nor the signature of the paper were in the handwriting of the deceased.
2. For that the court omitted to charge that if the jury found from the evidence that the defendant forged the receipt at the (533) time it bears date, to wit, 15 May, 1883, the offense was barred by the statute of limitations, and the jury should find the defendant not guilty.
The court was not requested thus to charge, and the second proposition alone was argued before the jury. The motion being denied upon the matters of law, it was renewed and the court asked to set aside the verdict for misconduct in some of the jurors, in support of which the affidavits of the sheriff in charge of the jury and of one of the jurors was read to the court. In reference to this matter the court finds the facts to be: That after the retirement of the jury one of their number took a flask from his pocket, and upon his invitation four drank of the whiskey it contained, the juror saying he had it for bowel complaint. None of the jurors were in any degree under the influence of the liquor, nor was the quantity taken sufficient to produce any sensible effect. The jury, while considering their verdict, remained at night in the court room; in a drawer, unlocked, in the room were left the receipt, deed *Page 416 
and magnifying glass used at the trial, but there was no evidence of their being seen by the jury. Upon these facts the motion was again refused, whereupon defendant's counsel proposed to offer other affidavits of the jurors, of whose evidence information had just come to him, showing that the jury had seen and inspected the papers with the glass. At the same time the solicitor asked, in the event of this evidence being received, to be allowed by the affidavit of other jurors, to prove the contrary. The court refused to hear the affidavit proposed, remarking that the law (against receiving affidavits from jurors to impeach their own verdict) had been settled from the case of the S. v. McLeod, 1 Hawks, 344, down to Jones v. Parker, 97 N.C. 33, and especially by the cases of S. v. Smallwood, 78 N.C. 560, and S. v. Brittain, 89 N.C. 481, that the verdict of a jury could not be thus impeached, (534) adding that on the previous day the court had heard the jurors' affidavit merely for information, but as the motion was not allowed no further testimony from this source for or against the application would be received.
After an ineffectual motion in arrest and for the case on appeal, the following errors were assigned:
1. The refusal to grant a new trial or to arrest the judgment.
2. The refusal to set aside the verdict for misconduct in the jurors. And
3. The refusal to hear the additional affidavits of jurors and to act upon them.
1. It is a well understood rule of practice upon appeals, reasserted time and again by this Court, that error cannot be assigned and become the subject of review in an omission or neglect to give a specific instruction, even when proper in itself, unless asked and thus called to the attention of the judge in order that he may rule thereon. This is just to the court and opposing counsel and indispensable to a fair trial and to prevent surprise. Simpson v. Blount, 3 Dev., 34; Brown v. Morris, 4 D. B., 429;S. v. O'Neal, 7 Ired., 251; Arey v. Stephenson, 12, Ired., 34; Hice v.Woodard, ibid., 293, and more recent cases.
2. Upon the findings of fact by the judge there was no such misconduct as in law to vitiate the verdict, and the setting it aside upon other ground was a matter of discretion not reviewable here. *Page 417 
3. We find no ground for arresting judgment in the form of the indictment, and no defects have been pointed out in the (535) argument.
These being the only grounds contained in the record upon which in the appeal we are required to review the judgment, it must be and is
No error. Affirmed.
Cited: McKinnon v. Morrison, 104 N.C. 363; Taylor v. Plummer,105 N.C. 58; Bethea v. R. R., 106 N.C. 280; Thompson v. Tel. Co.,107 N.C. 456; S. v. Fleming, ibid., 909; McFarland v. Improvement Co.,ibid., 369; Boon v. Murphy, 108 N.C. 192; Blackburn v. Fair, 109 N.C. 465;Emry v. R. R., ibid., 602; Merrill v. Whitmire, 110 N.C. 370; S. v.Jenkins, 116 N.C. 975; Patterson v. Mills, 121 N.C. 209; AutomotiveAssn. v. Cochran, 187 N.C. 25.